Ryan POSTHUMUS, Plaintiff,

v.

BOARD OF EDUCATION OF the MONA SHORES PUBLIC SCHOOLS, Dennis Vanderstelt, Jennifer Bustard, William Trujillo, and Terrence Babbitt, Defendants.

No. 1:03–CV–869.

United States District Court, W.D. Michigan, Southern Division.

Jan. 27, 2005.

See, also, 2005 WL 1109633.

Myra Dutton–Johnson, Attorney at Law, North Muskegon, MI, for plaintiff.

James S. Jamo, Grua, Jamo & Young, PLC, Lansing, MI, for Defendants.

## OPINION

QUIST, District Judge.

Plaintiff, Ryan Posthumus ("Posthumus"), has sued Defendants, the Board of Education of the Mona Shores Public Schools (the "Board"), Dennis Vanderstelt ("Vanderstelt"), Jennifer Bustard ("Bustard"), William Trujillo ("Trujillo"), and Terrence Babbitt ("Babbitt"), alleging claims under 42 U.S.C. § 1983 for violation of his First Amendment free speech rights and substantive and procedural due process rights under the Fourteenth Amendment. Posthumus' claims arise out of his suspension from Mona Shores High School. Posthumus also requests a ruling that the policy under which he was suspended is unconstitutionally vague and overbroad. Now before the Court is Defendants' motion for summary judgment. For the reasons set forth below, the Court will grant the motion and dismiss the case.

## I. *Facts*

The circumstances giving rise to the claims in this case occurred on May 23, 2002—the second to last day of school for the senior class at Mona Shores High School. Posthumus was a senior and was at the end of his career as a student at the school. Vanderstelt, Bustard, and Trujillo were, and currently are, respectively, the Assistant Principal, the Dean of Students, and Principal of the high school. Babbitt was, and currently is, the Superintendent of the school district.

On the morning of May 23, the senior honor students were taking their places in line in the hallways around the school auditorium in preparation for an honors assembly. The purpose of the assembly was to recognize seniors, such as Posthumus, for their achievements as honors students. The honors assembly is a relatively formal event, and all students participate, either by being physically present or by watching the ceremony on television monitors in classrooms. Vanderstelt was in charge of the assembly.

At about 7:55 a.m., shortly before the assembly was to begin, Vanderstelt walked down the line of students to make sure they were ready to proceed. As he walked past Posthumus, Vanderstelt noticed that Posthumus was holding a package of graham crackers. Vanderstelt took the package of crackers from Posthumus (whether Vanderstelt said anything to Posthumus at

that time is a disputed fact, but is not material to the instant motion) and kept walking. Posthumus left his place in line and followed Vanderstelt down the hall, demanding to know why Vanderstelt took the crackers and when they would be returned. Vanderstelt claims that he told Posthumus three times that he would return the crackers after the assembly, but Posthumus denies this and claims that Vanderstelt ignored him and kept walking.

After Vanderstelt turned the corner, Posthumus stepped around and in front of Vanderstelt so as to block Vanderstelt's progress. Posthumus again demanded to know why Vanderstelt took his crackers and was apparently attempting to take the crackers out of Vanderstelt's hand. Posthumus kept walking in front of Vanderstelt for several feet. Defendants claim that Posthumus put his forearm into Vanderstelt's chest, while Posthumus claims that Vanderstelt rammed into Posthumus. At one point, Vanderstelt exclaimed, "You are my witnesses, he's hindering my progress, don't touch me." Bustard, who was in the hallway supervising students nearby, heard Venderstelt's statement and looked to see what was going on. Bustard said to Posthumus, "It's not worth it, drop it." Posthumus turned to look at Bustard, and Vanderstelt stepped around Posthumus and continued walking down the hall. As Vanderstelt walked away, Posthumus loudly referred to Vanderstelt as a "dick" (Defendants claim that Posthumus yelled to Vanderstelt, "You are the biggest dick I know," while Posthumus claims that he told people nearby that Vanderstelt was "such a dick"). Posthumus returned to his place in line and the assembly was conducted without further incident.

Following the assembly, Bustard and Vanderstelt met with Trujillo to discuss the incident. They determined that Posthumus' conduct amounted to severe inappropriate behavior and compared other similar instances of inappropriate behavior to determine the possible consequences. (Bustard Dep. at 24–25, attached to Pl.'s Exs.) Those consequences included suspension up to expulsion. (*Id.* at 25.) Bustard, Vanderstelt, and Trujillo did not reach a decision at that time regarding the outcome, but they agreed that they would speak with Posthumus during sixth hour later in the day. (*Id.*) After the meeting, Bustard spoke with three student witnesses and obtained their written statements.

At lunchtime later that day, Bustard approached Posthumus in the lunchroom to discuss the incident. During the conversation, Posthumus admitted that he was wrong to call Vanderstelt a "dick." (*Id.* at 47.) After several minutes Posthumus became upset and walked away. Bustard informed him that she would talk to him later about the incident.

During sixth hour, Bustard retrieved Posthumus from class and escorted him back to her office. Bustard described the meeting with Posthumus as follows:

> When the meeting began, I told Ryan why he was in my office. I explained to him the inappropriate behavior, explained to him the situation was severe. As I couldn't get much further and Ryan became very agitated, used foul language at me, was very insultive, Mr. Trujillo had to intervene and, at that point, Ryan had the opportunity to speak on his behalf.
>
> He chose to use vulgarity, was uncooperative, and used personal insults against me. So at that point—At that point, Mr. Trujillo explained to Ryan that, you know, these would be the consequences: that he would not be allowed to participate in commencement, the senior breakfast, there was a senior mock elections in the evening, a senior banquet—I'm sorry—and that he would

be suspended, not to be on school grounds. At that point, Ryan stormed out of my office and left.

(*Id.* at 51.) Bustard called Posthumus' mother and informed her of the incident. Bustard and Trujillo then determined that the consequences would be a ten-day suspension. Bustard prepared and gave a letter to Posthumus' mother informing her of the ten-day suspension and the reasons for the suspension. The letter also warned that Posthumus would be charged with trespassing if he entered school grounds. (*Id.* at 52–53.) As a result of the suspension, Posthumus missed commencement and other senior events.

Posthumus and his mother appealed the decision to the Board on May 25, 2002. The Board affirmed the decision on May 27, 2002, without affording Posthumus a hearing or the opportunity to present evidence. Posthumus thereafter filed this action claiming violations of his civil rights.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

■ Defendants raise several grounds in support of their motion, including: (1) Defendants are entitled to governmental immunity under state law; (2) Vanderstelt, Bustard, Trujillo, and Babbitt are entitled to qualified immunity under federal law; (3) there is no evidence that a policy or custom of the Board was the "moving force" behind the alleged constitutional violations, as required by *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), to impose liability against the Board; (4) there is no evidence that Babbitt or Vanderstelt took any action that caused a violation of Posthumus' civil rights; (5) there is no evidence that Posthumus suffered any damages as a result of the alleged due process violations; and (6) the claim for injunctive relief is moot. The Court finds it unnecessary to address all of Defendants' arguments because it concludes that Posthumus' claims fail at the preliminary stage of the qualified immunity analysis.[1]

---

1. Defendants' argument based upon state law immunity fails because Posthumus' claims are based solely upon federal law. Many courts have recognized that immunity granted under state law does not apply to claims alleging violations of federal civil rights. *See Cantu v. Rocha*, 77 F.3d 795, 805 (5th Cir.1996) (stating that "[f]ederal immunity law shields state officials from personal liability under federal law for civil damages"); *Short v. City of West Point*, No. 1:95CV359–D–D, 1996 WL 737535,

at *6 (N.D.Miss. Dec.19, 1996) (finding a defendant's claim to immunity under state law "unavailing as violative of the Supremacy Clause"); *Watson v. McGee*, 527 F.Supp. 234, 244 (S.D.Ohio 1981) (stating that "even if the City of Dayton is immune from liability under Ohio law for the operation of the Dayton City Jail, that fact is simply not pertinent to the present action, which has been initiated under § 1983").

■ "Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir.2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The Sixth Circuit follows a three-step inquiry in determining whether a defendant is entitled to qualified immunity: (1) the court must first determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred: (2) the court then determines whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and (3) the court must determine whether the plaintiff has offered sufficient evidence to show that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003). However, "[i]f the court finds no valid claim pursuant to 42 U.S.C. § 1983, the court need not reach the issue of qualified immunity." *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998); *see also Blair v. Meade*, 76 F.3d 97, 100 (6th Cir.1996) (noting that a court reaches the issue of whether the alleged right was clearly established only if it first concludes that the plaintiff has established a violation of a constitutional right).

## A. Procedural Due Process Claim

■ In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court recognized that a high school student facing a suspension from school possesses a property interest protected under the due process clause of the Fourteenth Amendment. The Court in *Goss* enunciated the procedural due process standard for short-term school suspensions:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Id.* at 581, 95 S.Ct. at 740. Given the brief nature of the deprivation involved in a suspension, a school need not "afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583, 95 S.Ct. at 740. Formal procedures are not required, and "[t]here need be no delay between the time 'notice' is given and the time of the hearing." *Id.* at 582, 95 S.Ct. at 740. *See also C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir.1996) (stating that "once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands"). Because Posthumus was suspended for ten days, *Goss* provides the standard for determining whether he was afforded due process.

■ Bustard testified that she met with Posthumus in her office during sixth hour to discuss the incident. She said that she explained the inappropriate behavior to Posthumus and advised him that the situation was severe. Bustard also said that Posthumus had the opportunity to present his side of the story, but instead of taking the opportunity to do so, he chose to be uncooperative and berated Bustard with insults and profanity. Under these cir-

cumstances, Posthumus was afforded the process required under *Goss*. Posthumus claims that he was not given an opportunity to respond to the allegation that he intimidated Vanderstelt. However, Posthumus has failed to submit an affidavit or any admissible evidence refuting Bustard's testimony. *See* Fed.R.Civ.P. 56(c).

Posthumus argues that the evidence shows that the decision to discipline him was made before an investigation was even initiated. In particular, Posthumus concludes that the disciplinary decision must have been made prior to the time Bustard met with Posthumus because the three student witness statements that Bustard obtained show that all of the students knew that Posthumus was going to be suspended for the remainder of the year and would not be permitted to walk at the commencement ceremony. Even assuming that the witness statements (one of which is unsigned) are admissible under the Federal Rules of Evidence, Posthumus' argument must be rejected because it requires stacking inference upon inference to reach a speculative conclusion. That is, the argument assumes that Bustard in fact discussed the discipline with the student witnesses and that the final decision had already been made at that time. However, Bustard testified under oath that no final decision was made until after Posthumus left Bustard's office, and Posthumus has not offered any admissible evidence to create an issue of fact on this point.

Posthumus also argues that the removal and deprivation was more than *de minimus* because he was barred from his once-in-a-lifetime opportunity to participate in his high school graduation ceremony. As the Court understands it, Posthumus contends this case is an "unusual situation" as noted in *Goss:* "Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary pro-

cedures will be required." 419 U.S. at 584, 95 S.Ct. at 740. Posthumus has failed to cite any authority supporting his argument that exclusion from graduation or other senior events constitutes the type of "unusual situation" contemplated in *Goss* that deserves additional procedural safeguards. In the absence of such authority, this Court declines to hold that more formal procedures are required when a suspension includes collateral sanctions. *See Donovan v. Ritchie*, 68 F.3d 14, 18 (1st Cir.1995) (rejecting the plaintiff's argument that a bar to interscholastic athletics and other school activities, in addition to a ten-day suspension, took the case outside of the holding in *Goss* because "the focus is whether the student was given the opportunity to present his version of what occurred"). Moreover, in spite of the suspension and loss of privileges, Posthumus received his diploma on time, has enrolled in college, and not suffered any adverse consequences. *See Paredes by Koppenhoefer v. Curtis*, 864 F.2d 426, 428–29 (6th Cir.1988) (rejecting the assertion that a suspension for possession of a drug look-alike substance was an "unusual situation" that would tarnish the plaintiff's reputation and restrict his employment opportunities). Accordingly, the procedural due process claim fails.

## B. Substantive Due Process Claim

 Posthumus also contends that Defendants violated his right to substantive due process because the punishment based upon his criticism of Vanderstelt's disciplinary tactics was not rationally related to the school's interests in preventing students from threatening or intimidating school administrators. The substantive due process component is not concerned with whether procedures were followed, but rather "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Dan-*

*iels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Substantive due process encompasses, in addition to those rights expressly set forth in the Bill of Rights, "fundamental rights implicit in the concept of ordered liberty, and deeply rooted in this Nation's history and tradition[s]." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998). The list of fundamental rights includes: "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment." *Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir.2000). "[T]he right to attend public school is not a fundamental right for the purposes of due process analysis." *Id.* at 575. When a fundamental right is not at issue, the government's action must be upheld if it is rationally related to a legitimate state interest. *Id.* Thus, "[i]n the context of school discipline, a substantive due process claim will succeed only in the 'rare case' when there is 'no "rational relationship between the punishment and the offense." ' " *Id.* (quoting *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir.1989)) (quoting *Brewer v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 264 (5th Cir.1985)).

██ Posthumus has failed to show circumstances giving rise to a substantive due process claim. Posthumus does not argue, nor could he reasonably claim, that he had a fundamental right to attend school or to attend the commencement ceremony or other graduation events. Thus, he is required to show that there was no rational relationship between the suspension and the offense. Posthumus cannot make such a showing, because a school has an interest in ensuring that its students act in a respectful manner towards teachers and administrators and that they do not interfere with the orderly conduct of school activities. In light of Posthumus' conduct towards Vanderstelt (even crediting Posthumus' version that he did not initiate physical contact with Vanderstelt), there was a rational relationship between the punishment and the offense.

Posthumus' reliance upon *Seal, supra,* does not further his argument, because *Seal* involved a substantially different set of facts. In that case, the plaintiff was expelled from school under the district's "zero tolerance" weapons policy after school officials found a knife in the glove compartment of his car. The plaintiff's friend had placed the knife inside the glove compartment without the plaintiff's knowledge. The school board upheld the expulsion under the policy, even though the plaintiff did not knowingly possess the knife. The court concluded that expelling a student for weapons possession if the student does not knowingly possess the weapon would be irrational because the student could not use the weapon to injure others if he did not know he possessed it. *Seal,* 229 F.3d at 575–76. Unlike the plaintiff in *Seal,* Posthumus does not contend that he did not knowingly commit the conduct for which he was suspended. Rather, although he disputes some of the alleged conduct, Posthumus concedes that he knowingly engaged in at least some of the charged conduct.

## C. First Amendment Claim

Posthumus contends that Defendants violated his First Amendment rights by suspending him for expressing his opinion regarding Venderstelt's handling of the situation. Although Posthumus concedes that he openly referred to Vanderstelt as a "dick," he says that he "did not call Vanderstelt a name," but was only giving "his opinion regarding Vanderstelt's confiscation of his unopened food." (Pl.'s Br. Opp'n at 7.)

■ The Supreme Court has recognized that school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). "They cannot be punished merely for expressing their personal views on the school premises—whether 'in the cafeteria, or on the playing field, or on the campus during the authorized hours,'—unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (quoting *Tinker*, 393 U.S. at 509, 512–13, 89 S.Ct. at 738, 739–40) (citation omitted). In *Tinker*, students were suspended for wearing black armbands in protest of the Viet Nam war. There was no evidence that the armbands caused any disturbance or disrupted school activities. The Court noted that the speech—expression of political views "akin to 'pure'"—did not touch upon areas of legitimate school concern, such as the length of skirts or the type of permissible clothing, but instead was "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Tinker*, 393 U.S. at 508, 89 S.Ct. at 737. The Court held that such speech is entitled to First Amendment protection unless school officials can show that the forbidden expression "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509, 89 S.Ct. at 738 (internal quotations and citation omitted).

The Court also considered public school students' free speech rights in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), although in a different context than *Tinker*. In *Fraser*, the student was suspended for using sexual innuendo in a speech in support of a student government candidate during a school-sponsored assembly. The Court held that the school acted appropriately in disciplining the student for his "lewd and indecent speech" because "[u]nlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint." *Id.* at 685, 106 S.Ct. at 3165. In examining a school's interest in prohibiting lewd or vulgar speech, the Court noted that while students have an interest in expressing unpopular and controversial views, schools have a "countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681, 106 S.Ct. at 3163. The Court observed that because "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," school officials may limit speech in schools in ways that the government could not do outside of the school context. *Id.* at 682–83, 106 S.Ct. at 3164. Thus, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate rests with the school board." *Id.* at 683, 106 S.Ct. at 3164.

In a third case, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court addressed limits on students' free speech rights in the context of school-sponsored speech. In *Hazelwood*, student staff members of a school newspaper alleged that school officials violated their First Amendment rights when the principal decided to excise two articles from the school paper. The paper was published by a journalism class. Pursuant to normal procedures, the principal decided that a story describing three students' experiences with pregnancy and an article discussing the impact of divorce on students at the school should not appear in the newspaper because the

subjects of the articles were inappropriate and/or created the potential for invading students' or parents' privacy. The Court noted that unlike *Tinker*, which concerned the issue of a school's ability to prohibit a student's private views on an issue, the issue before it concerned limitations on school-sponsored speech, such as "publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* at 271, 108 S.Ct. at 571. The Court concluded that the principal's decision did not infringe the students' rights because a school has an important interest in "assur[ing] that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.*

■ The speech at issue in this case was not school-sponsored speech, and therefore must be analyzed under either *Fraser* or *Tinker.* The Court concludes that *Fraser* provides the appropriate framework for analyzing Posthumus' claim because Posthumus was disciplined for referring to Vanderstelt as a "dick"—a term widely considered to be lewd or vulgar and, especially when used towards a person in authority, disrespectful. *Fraser* teaches that judgments regarding what speech is appropriate in school matters should be left to the schools rather than the courts. *Fraser,* 478 U.S. at 683, 106 S.Ct. at 3164. A school is entitled to "make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685–86, 106 S.Ct. at 3165. In the instant case, the Mona Shores High School Student Management Handbook contains the following

provision regarding cooperation with school personnel:

It is expected students will follow common rules of courtesy. Violations of rules of common courtesy include the failure to follow staff members' directions, talking back to a staff member, and the use of abusive or obscene language directed toward a staff member.

(Student Management Handbook at 61, Defs.' Br. Supp. Ex. F.) Posthumus' reference to Vanderstelt as a "dick" constitutes "abusive or obscene language directed toward a staff member" and was a proper basis for discipline under *Fraser.*

■ Referring to the *Tinker* standard, Posthumus argues that, "even if we assume for the sake of argument that [his] reference to Vanderstelt as a 'dick' was vulgar or offensive, there is no showing that his language disrupted the educational process, especially where used in the hallway and only to peers nearby." (Pl.'s Br. Opp'n at 11.) The Court rejects this argument because it assumes that a student's speech regarding a private view on a matter is always protected under *Tinker* so long as it is not likely to lead to substantial disruption of or material interference with school activities. Posthumus' argument cannot be sustained because his statement was insubordinate speech directed toward a school official—the type of activity courts have declined to recognize as being protected under the First Amendment. *See Wildman v. Marshalltown Sch. Dist.,* 249 F.3d 768, 771–72 (8th Cir.2001) (holding that the plaintiff failed to present a claim based upon her letter to other members of the basketball team in which she suggested that the team unite in defiance of the coach and referred to the coach's decisions as "bullshit"); *Pinard v. Clatskanie Sch. Dist. GJ,* 319 F.Supp.2d 1214, 1218 (D.Or.2004) (concluding that the plaintiffs, former high school basket-

ball players who submitted a written petition requesting that the coach resign, failed to show a First Amendment violation because the plaintiffs were not engaged in constitutionally protected activity). Moreover, Posthumus' speech did not concern a political issue or a matter of public concern, as in *Tinker*, but instead was directed at Posthumus' private grievance regarding Vanderstelt's confiscation of Posthumus' graham crackers. *See Pinard*, 319 F.Supp.2d at 1219 (concluding that speech concerning a matter of personal interest to the plaintiffs was not constitutionally protected activity). Finally, the Court rejects Posthumus' assertion that his speech did not disrupt the educational process. Insubordinate speech always interrupts the educational process because it is contrary to principles of civility and respect that are fundamental to a public school education. Failing to take action in response to such conduct would not only encourage the offending student to repeat the conduct, but also would serve to foster an attitude of disrespect towards teachers and staff. Accordingly, the school acted within its authority in punishing Posthumus for his statement.

### D. Municipal Liability

As noted above, Defendants argued in their motion that the Board is entitled to summary judgment on Posthumus' claims because Posthumus cannot show that a policy or custom of the Board was the "moving force" behind the alleged constitutional violations. Posthumus did not specifically address this argument in his response brief. However, in light of the Court's conclusion that there was no constitutional violation, any claim against the Board must fail. *See Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir. 2004).

### E. Overbreadth Challenge

As noted at the beginning of this Opinion, Posthumus also alleged in his complaint that the Board's policies regarding "common courtesy" and "intimidation toward staff" are unconstitutionally vague and overbroad. Defendants did not address this particular claim in their brief in support of their motion. However, Defendants' motion sought summary judgment on the entire case. Posthumus briefly mentioned this claim in his response brief but did not present any argument regarding this claim or suggest that summary judgment is improper because that claim is still in issue. Defendants were not obligated to raise this issue in their motion for summary judgment, and by failing to assert it in his response brief, Posthumus has waived or abandoned the issue. *Ortiz v. Gaston County Dyeing Mach. Co.*, 277 F.3d 594, 597 (1st Cir.2002) (holding that the plaintiff abandoned any argument that Massachusetts law should apply by failing to raise the argument in his response to the defendant's summary judgment motion); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (refusing to consider arguments not raised in response to summary judgment motions).

Apart from the waiver, the Court nonetheless concludes that the claim fails on the merits. The overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). A law "is unconstitutionally overbroad when there exists a 'realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.'" *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir.

1998) (quoting *Leonardson v. City of East Lansing,* 896 F.2d 190, 195 (6th Cir.1990)). The void-for-vagueness doctrine, which arises under the Due Process Clause, protects speakers "from arbitrary and discriminatory enforcement of vague standards." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 588, 118 S.Ct. 2168, 2179, 141 L.Ed.2d 500 (1998). "Due process requires that this Court hold a statute, ordinance, or resolution void for vagueness 'if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.'" *Smith ex rel. Smith v. Mount Pleasant Pub. Schs.,* 285 F.Supp.2d 987, 993 (E.D.Mich.2003) (quoting *United Food,* 163 F.3d at 358–59).

The Board's policy regarding "common courtesy," quoted above, provides that students are expected to follow rules of common courtesy, and then provides specific examples, such as failing to follow staff members' directions, talking back to a staff member, and the use of abusive or obscene language towards a staff member. This rule is limited to types of disruptive conduct that undermine the authority of school staff and are not protected under the First Amendment. In addition, the rule provides sufficient notice of what conduct is prohibited. As the Supreme Court has noted, "school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions," *Fraser,* 478 U.S. at 686, 106 S.Ct. at 3166, and this rule complies with due process requirements. The "intimidation toward staff" policy referred to in Posthumus' complaint appears to come from the "Major Misconduct" policy, which provides:

> Any student involved in an assault, possession of a weapon, intimidation toward staff or students, arson, theft, vandalism, falsifying school records, drugs, alcohol, fighting, extortion, and other similar serious violations will be subject to immediate suspension pending a hearing of the facts to determine the school's course of action. Disciplinary action may range from suspension and/or police involvement to expulsion.

(Student Management Handbook at 65.) This rule also passes due process muster, because it defines specific types of conduct (most of it being physical and non-speech related) that may be punished, none of which is protected by the First Amendment. While "intimidation toward staff or students" might conceivably reach some protected speech, the examples provided in the rule clarify that the proscribed conduct is limited to threats of physical harm or other similar improper and unprotected conduct.

### IV. *Conclusion*

For the foregoing reasons, the Court will grant Defendants' motion for partial summary judgment.

An Order consistent with this Opinion will be entered.