FISHER, Circuit Judge,
dissenting, with whom SCIRICA, RENDELL, BARRY, JORDAN, and VANASKIE, Circuit Judges, join.
Today’s holding severely undermines schools’ authority to regulate students who “materially and substantially disrupt the work and discipline of the school.” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). While I agree with the majority’s apparent adoption of the rule that off-campus student speech can rise to the level of a substantial disruption, I disagree with the Court’s application of that rule to the facts of this case. The majority misconstrues the facts. In doing so, it allows a student to target a school official and his family with malicious and unfounded accusations about their character in vulgar, obscene, and personal language. I fear that our Court leaves schools defenseless to protect teachers and school officials against such attacks and powerless to discipline students for the consequences of their actions.
J.S., an eighth-grade student at Blue Mountain Middle School, was upset with her principal James McGonigle for disciplining her for dress-code violations, and she created a MySpace page in retaliation. At the URL http://www.myspace.com/ kidsrockmybed, J.S. accused her principal of having sex in his office, “hitting on students and their parents,” and being a “sex addict.” She called him a “dick head,” stated that he was “put on this world with a small dick,” and called him a “fagass.” She stated that his wife “looks like a man” and that his son “looks like a gorilla.” She stated that the principal enjoys “riding the fraintrain,” — a reference to his wife Debra Frain, who worked at the school as a guidance counselor — and that “it’s a slow ride but you’ll get there eventually.”
I respectfully dissent from the majority’s ruling that the Blue Mountain School District’s ten-day suspension of J.S. for making false accusations against McGonigle violated her First Amendment right to free speech. The majority holds that “[t]he facts in this case do not support the conclusion that a forecast of substantial disruption was reasonable.” Maj. Op. at 928. But the majority makes light of the harmful effects of J.S.’s speech and the serious nature of allegations of sexual misconduct. Broadcasting a personal attack against a school official and his family online to the school community not only causes psychological harm to the targeted individuals but also undermines the authority of the school. It was permissible for the School District to discipline J.S. because substantial disruption was reasonably foreseeable.
*942 I.
I disagree with the majority’s assessment that the four opinions of the Supreme Court on student speech “compel the conclusion that the School District violated J.S.’s First Amendment free speech rights.” Maj. Op. at 925. In fact, the Supreme Court has never addressed whether students have the right to make off-campus speech that targets school officials with malicious, obscene, and vulgar accusations. In Tinker, the Court examined whether a school had the authority to prevent students from wearing black arm bands on campus in protest of the Vietnam War. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. In Bethel School District v. Fraser, the Court held that a school could suspend a student for giving an obscene and vulgar speech on campus at a school-sponsored event. 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The Court in Hazelwood School District v. Kuhlmeier ruled that a school could exercise editorial control over the contents of a student newspaper so long as it was “reasonably related to legitimate pedagogical concerns.” 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). And in Morse v. Frederick, the Court determined that a school could sanction a student for unfurling a banner that promoted illegal drug use at a school-approved event. 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). None of these decisions control the facts of this case nor do they compel a conclusion in favor of J.S.
The Supreme Court has only briefly and ambiguously considered whether schools have the authority to regulate student off-campus speech. See Emily Gold Wald-man, Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions, 19 Wm. & Mary Bill Rts. J. 591, 617-18 (2011). In Tinker, the Court stated that “conduct by the student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of rights of others is, of course, not immunized by constitutional guarantee of freedom of speech.” 393 U.S. at 513, 89 S.Ct. 733. But it is unclear if “in class or out of it” means to distinguish the classroom from the world beyond the schoolhouse gates, or if it simply means out of class but in the cafeteria, schoolyard, or other areas on school grounds. Again, in Kuhlmeier, the Court stated that,
We have ... recognized that the First Amendment rights of students in the public schools “are not automatically coextensive with the rights of adults in other settings,” Bethel School District No. 403 v. Fraser, 478 U.S. 675, 682 [106 S.Ct. 3159, 92 L.Ed.2d 549] (1986), and must be “applied in light of the special characteristics of the school environment.” Tinker, [ ]393 U.S.[ ] at 506 [89 S.Ct. 733.] A school need not tolerate student speech that is inconsistent with its “basic educational mission,” Fraser, [] 478 U.S.[] at 685,[106 S.Ct. 3159] even though the government could not censor similar speech outside the school.
484 U.S. at 266, 108 S.Ct. 562. But the Court’s meaning was left unclear. Either the Court meant to distinguish the school’s authority to regulate student speech on campus from the school’s authority to regulate off-campus speech, or the Court was simply contrasting the school’s authority to regulate student speech with the government’s authority to regulate adult speech. In Morse, the Court declined the opportunity to determine whether schools have the authority to regulate off-campus speech. Even though the student created the banner at issue off campus and was off school grounds when he unfurled it, the Court *943 held that it was a school speech case because the banner was displayed at a school-approved event during normal school hours. Morse, 551 U.S. at 400-01, 127 S.Ct. 2618. The Court, however, did state in dicta that schools have more limited authority to regulate obscene speech outside of the school environment when it claimed that “[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected.” Id. at 404, 127 S.Ct. 2618 (citing Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). But the Court did not address the issue of whether schools can regulate off-campus speech which causes substantial on-campus disruption under Tinker.
II.
I believe that the rule adopted by the Supreme Court in Tinker should determine the outcome of this case. Under Tinker, we must examine whether J.S.’s speech created a significant threat of substantial disruption at the Middle School. School authorities need not wait until the disruption actually occurs if they are able to “demonstrate any facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities.” Tinker, 393 U.S. at 514, 89 S.Ct. 733. If the Middle School reasonably forecasted substantial disruption, then it had the authority to regulate J.S.’s speech. The majority seems to acknowledge just as much, but finds that “[t]he facts simply do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school as a result of J.S.’s profile.” Maj. Op. at 931.
The majority reaches this conclusion by contrasting the facts of Tinker with those of our case. It notes that at the time of Tinker the United States had over 200,000 troops deployed in Vietnam and the country was divided over the issue. The majority cites the dissenting opinion of Justice Black who argued that the record demonstrated that the black arm bands worn by students in protest of the Vietnam War would distract students and disrupt the classroom. And yet, notes the majority, the Court in Tinker held that “ ‘the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.’ ” Maj. Op. at 929 (emphasis in original) (quoting Tinker, 393 U.S. at 514, 89 S.Ct. 733). From a comparison with the facts of this case, the majority draws the conclusion that J.S.’s speech did not cause a substantial disruption at the Middle School nor was it reasonable to forecast a substantial disruption.
The majority is correct in finding it appropriate to distinguish the facts of Tinker, but it fails to heed several salient distinctions that compel the opposite conclusion. The speech in Tinker was political speech, was not directed at the school or at school officials, and was not vulgar, obscene, malicious, or harmful. Moreover, the majority misconstrues the facts of this case, making light of J.S.’s accusations and underestimating its impact.
A.
The speech at issue in Tinker did “not concern aggressive, disruptive action or even group demonstrations.... [It was] a silent, passive expression of opinion, unaccompanied by any disorder or disturbance.” 393 U.S. at 508, 89 S.Ct. 733. The Court was concerned that peaceful and nonintrusive political speech was censored by the school. The Court was motivated by a fear of totalitarianism and the need to protect freedom of expression to *944 preserve the foundations of a democratic system. What made the school’s prohibition so troubling was that it appeared to be a content-based regulation of political speech. The school prohibited students from protesting the war, whereas other students were permitted to wear political buttons. Some even wore the Iron Cross, a symbol traditionally associated with Nazism. “Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible.” Id. at 511, 89 S.Ct. 733. A government entity regulating political speech that it did not agree with was eerily similar to that of totalitarian regimes. “In our system, state-operated schools may not be enclaves of totalitarianism .... [Students] may not be confined to the expression of those sentiments that are officially approved.” Id.
In order to maintain a thriving democracy, students cannot be unreasonably encumbered in their freedom to express moral, political, and social ideals and beliefs. “ ‘The classroom is peculiarly the “marketplace of ideas.” The Nation’s future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth “out of a multitude of tongues, (rather) than through any kind of authoritative selection.” ’ ” Id. at 512, 89 S.Ct. 733 (quoting Keyishicm v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (internal citations omitted)). Schools should foster an environment of learning that is vital to the functioning of a democratic system and the maturation of a civic body.
Allowing for the expression of beliefs and opinions in a robust but respectful environment encourages engagement, promotes self-improvement, and furthers the search for truth. The Court in Tinker embraced the freedom of speech as an essential component of the educational system. “When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without ‘materially and substantially interfering) with the requirements of appropriate discipline in the operation of the school’ and without colliding with the rights of others.” Id. at 512-13, 89 S.Ct. 733 (alteration in original) (citation omitted).
B.
J.S., by contrast, targeted her principal and her principal’s family with lewd, vulgar, and offensive speech. She created a MySpace page using a photograph of McGonigle that she had taken from the School District website, and she publicly disseminated numerous hurtful accusations. She accused McGonigle of sexual misconduct: “fucking in [his] office,” “hitting on students and their parents,” and being a “sex addict.” She insulted McGonigle by calling him a “dick head,” stating that he was “put on this world with a small dick,” and calling him a “fagass.” And J.S. insulted his family. She stated that his wife “looks like a man” and that his son “looks like a gorilla.” She stated that the principal enjoys “riding the fraintrain” and that “it’s a slow ride but you’ll get there eventually.”
The School found this speech to be in violation of school policy because J.S. made “false accusations about the school principal” and violated copyright law in using McGonigle’s picture. App. A70. This constituted a level IV infraction because it involved “making a false accusation about a school staff member,” id. A66, and the School imposed a ten-day suspension.
*945 J.S.’s speech is not the type of speech that the Tinker Court so vehemently protected. I agree with the majority that the facts in the record fail to demonstrate substantial disruption at the School. But the profile’s potential to cause disruption was reasonably foreseeable, and that is sufficient.[1] Tinker, 393 U.S. at 514, 89 S.Ct. 733. Two forms of disruption were foreseeable. First, the MySpace page posed a reasonably foreseeable threat of interference with the educational environment. If J.S.’s speech went unpunished, it would undermine McGonigle’s authority and disrupt the educational process. Second, J.S.’s speech posed a reasonably foreseeable threat of disrupting the operations of the classroom. It was foreseeable that J.S.’s false accusations and malicious comments would disrupt McGonigle and Frain’s ability to perform their jobs. I handle both forms of disruption in turn. Finally, I discuss how the majority misconstrues the facts to underestimate the foreseeable impact of J.S.’s speech.
1.
J.S.’s speech posed a threat of substantial disruption to the educational environment. The majority fails to recognize the effects of accusations of sexual misconduct. J.S. created the profile at the URL ending in: “kidsrockmybed.” She accused McGonigle of having sex in his office, “hitting on students and their parents,” and being a “sex addict.” The profile stated that “I love children [and] sex (any kind).”
Such accusations interfere with the educational process by undermining the authority of school officials to perform their jobs. In a case where a student referred to his assistant principal as a “dick,” the district court noted:
Insubordinate speech always interrupts the educational process because it is contrary to principles of civility and respect that are fundamental to a public school education. Failing to take action in response to such conduct would not only encourage the offending student to repeat the conduct, but also would serve to foster an attitude of disrespect towards teachers and staff.
Posthumus v. Bd. of Educ. of the Mona Shores Pub. Sch., 380 F.Supp.2d 891, 902 (W.D.Mich.2005). J.S. did not only refer to her principal as a “dick” but launched a vulgar attack on his character and accused him of sexual misconduct. J.S. embarrassed, belittled, and possibly defamed McGonigle. If J.S. were not disciplined, it would demonstrate to the student body that this form of speech is acceptable behavior — whether on or off campus.
Further, accusing school officials of sexual misconduct poses a foreseeable threat of diverting school resources required to correct the misinformation and remedy confusion. It was reasonably foreseeable that the accusations made in the MySpace profile would be shared with parents and teachers. McGonigle’s character would come under investigation, and his fitness to occupy a position of trust with adoles *946 cent children would be questioned. It is inevitable that as more students and parents learned of the profile, the School would experience disruption. While Superintendent Joyce Romberger may have dismissed the accusations as false because she knew him,[2] students and parents unfamiliar with McGonigle may have had serious questions about McGonigle’s character and actions. Parents would become concerned that their children were supervised by a man accused of having sex in his office, being a “sex addict,” and “hitting on” their children. It was reasonably foreseeable that school administrators would have to spend a substantial amount of time alleviating these concerns. The Middle School acted reasonably in requesting the removal of the MySpace page, contacting J.S.’s parents, and suspending J.S. for ten days. If such steps were not taken, it is likely that the Middle School would have suffered substantial disruptions because McGonigle’s authority would have been severely undermined and school resources would have been diverted to alleviate the inevitable concerns.
2.
The majority also overlooks the substantial disruptions to the classroom environment that follow from personal and harmful attacks on educators and school officials. J.S.’s speech attacked McGonigle and Frain in personal and vulgar terms and broadcasted it to the school community. This kind of harassment has tangible effects on educators.[3] It may cause teachers to leave the school and stop teaching altogether, and those who decide to stay are oftentimes less effective. See Jiña S. Yoon, Teacher Characteristics as Predictors of Teacher-Student Relationships: Stress, Negative Affect, and Self-Efficacy, 30 Soc. Behav. & Personality 485, 491 (2002) (“Not only does teacher stress affect teachers’ general attitude toward teaching, but also it is likely to influence the quality of their relationships with students.”); Suzanne Tochterman & Fred Barnes, Sexual Harassment in the Classroom: Teachers as Targets, 7 Reclaiming Child & Youth 21, 22 (1998) (noting that educators who are subject to sexual harassment feel: “detachment; shame; horror; uncertainty; demoralization; fear; feelings of being unappreciated, targeted, objectified, belittled, and victimized; sadness; anger; avoidance; feeling defeated; blame; separation; and attack”). Educators be *947 come anxious and depressed and feel unable to relate to their students. Id. They lose their motivation to teach, and their students suffer as a result. “Even if the school official remains at the school, ‘anxious, depressed or disengaged teachers are less able to sustain the academic engagement of their students/ thus harming student motivation and behavior.” Waldman, supra at 646 (quoting Benoit Galand, et al., School Violence and Teacher Professional Disengagement, 77 Brit. J. of Educ. Psychol. 465, 467 (2007)).
These studies are consistent with cases involving hostile, vulgar, and obscene student speech directed at school officials. In Wisniewski v. Board of Education of Weedsport Central School District, the Second Circuit noted that a teacher who was subjected to hostile student speech became distressed and had to stop teaching the student’s class. 494 F.3d 34, 35-36 (2d Cir.2007). Similarly, in J.S. v. Bethlehem Area School District, the teacher,
suffered stress, anxiety, loss of appetite, loss of sleep, loss of weight, and a general sense of loss of well being as a result of viewing the [hostile and offensive student] web site. She suffered from short-term memory loss and an inability to go out of the house and mingle with crowds. [The teacher] suffered headaches and was required to take anti-anxiety/anti-depressant medication.
569 Pa. 638, 807 A.2d 847, 852 (2002). The teacher was unable to return to school, and the “web site had a demoralizing impact on the school community.” Id. In Schroeder v. Hamilton School District, a teacher was subjected to anti-homosexual speech from students and parents and suffered a “nervous breakdown that ultimately resulted in his termination.” 282 F.3d 946, 950 (7th Cir.2002). In our case, McGonigle stated that he became distressed after viewing J.S.’s MySpaee profile. He stated, “I was very upset and very angry, hurt, and I can’t understand why [J.S.] did this to me and my family.” App. A333.
J.S.’s speech had a reasonably foreseeable effect on the classroom environment. In addition to causing a diminution in respect for authority and a diversion of school resources, J.S.’s speech posed reasonably foreseeable psychological harm to McGonigle and Frain that would impact their ability to perform their jobs. Being subject to such personal attacks, they may have been discouraged to interact with students and perhaps even motivated to leave without the institutional support of the School. Without effective punishment, McGonigle and Frain would have been less effective in fulfilling the educational mission of their positions. Furthermore, if the Middle School did not punish J.S., it was foreseeable that other students may have decided to personally attack McGonigle, Frain, or other members of the school. Cf Morse, 551 U.S. at 409-10, 127 S.Ct. 2618 (noting the “difficult” and “vitally important” role that school principals play and reasoning that “failing to act would send a powerful message to the students” in affirming school’s 10-day suspension of student for speech promoting illegal drug use). The Middle School protected its employees against such a vicious and personal attack, thereby preventing substantial disruption of the classroom environment. I believe our Court errs in precluding schools from protecting teachers and officials against such harassment.
3.
I question the majority’s assessment of the facts of this case.[4] Its conclusion that *948 a substantial disruption was not reasonably foreseeable rests on several mischaracterizations: that J.S.’s MySpace profile should be regarded as a “joke”; that her profile should not have been taken seriously; that because J.S. did not identify McGonigle by name, it lessened the impact of her profile; and that J.S. took steps to ensure that her profile remained private and did not reach the school. Each of these findings is flawed.
First, the majority makes light of J.S.’s post, characterizing it as a “joke” that, while “indisputably vulgar,” was “juvenile and nonsensical.” Maj. Op. at 929. The majority goes so far as to state that we should take J.S.’s speech less seriously because she intended it as a “joke.” See id. This is not the test adopted by Tinker. The intent of the speaker is of no consequence.[5] What determines the permissibility of the School’s response under the First Amendment is whether it was reasonable to foresee substantial disruption.
Moreover, it is not our role to determine how schools should treat accusations of sexual misconduct and personal attacks on school officials. School administrators, not judges, are best positioned to assess the potential for harm in cases like this one, and we should be loath to substitute our judgments for theirs. See Morse, 551 U.S. at 427, 127 S.Ct. 2618 (Breyer, J., concurring in part and dissenting in part) (warning against the dangers of interfering “with reasonable school efforts to maintain discipline”); cf. Fraser, 478 U.S. at 683, 106 S.Ct. 3159 (“The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.”). Thus, even if J.S.’s post can be treated as a juvenile joke, it does not mean that the School District had to treat it as such. For it is also eminently reasonable to treat accusations of sexual misconduct seriously. I believe our Court errs when it tells a school district how it should handle violations of its policy that are of as serious and grave a matter as false accusations of sexual misconduct.[6]
*949 The majority also draws conclusions from the fact that Superintendent Romberger had a duty to report allegations of misconduct and did not do so in this particular case. But the fact that Superintendent Romberger chose not to report the misconduct does not mean that it should not have been reported. Moreover, other schools who face this situation may properly choose to report allegations of misconduct. Our Court does a disservice when it treats allegations of sexual misconduct lightly and condones school districts for not taking action. The majority claims that no one could take the contents of J.S.’s post seriously. Id. But stating that the principal of a middle school has sex in his office and is a “sex addict” who enjoys “hitting on children and their parents” are serious allegations that cannot be taken lightly by any school official or by our Court.
The majority states that the profile did not identify McGonigle by name, school, or location. Maj. Op. 950. But this in no way lessens the gravity of harm. The profile identified McGonigle by posting his picture. There are no facts in the record demonstrating that anyone was at a loss as to who the profile was about.
The majority claims that J.S. did not intend for her accusations to reach the school. Maj. Op. at 948. Even if this is true, it is an unreasonable expectation that should not carry weight in our analysis. J.S. created a profile on a social networking site using McGonigle’s photograph, accused him of sexual misconduct, insulted his family members, and used exceptionally vulgar and obscene language. She then made the profile public and shared it with classmates. It was only a matter of time before the subject of her attack found out. And he did, two days later. The majority claims that J.S. “took specific steps to make the profile ‘private’ so that only her friends could access it.” Maj. Op. at 930. But there is another way to read this. After hearing from her fellow students about the buzz her profile had created, she made it “private,” but then continued to send the profile to her classmates, sharing it with twenty-two students. J.S. evinced an expectation that she could somehow share the profile amongst members of the school without the subject of her vehement attack finding out. The majority embraces this unreasonable expectation.
The majority also finds that the School District was barred by state law from punishing J.S. for off-campus speech. Maj. Op. at 948 n. 5. Pennsylvania law states that a School District has the authority to:
adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs ... as well as regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.
24 Pa.Stat.Ann. § 5-510. The majority relies on D.O.F. v. Lewisburg Area School District Board of School Directors, 868 A.2d 28 (Pa.Commw.Ct.2004), for the proposition that schools lack the authority to *950 regulate conduct that occurs outside of school during non-school hours. But this case is unrelated to the case before us. It involves a student’s use of drugs during non-school hours that had no effect on the school. Here, by contrast, a student directed speech about the school at members of the school and had a foreseeable impact on the operations of the classroom. McGonigle punished J.S. “to prevent interference with the educational process,” which the Pennsylvania Commonwealth Court has explicitly held is authorized under § 5-510. See D.O.F., 868 A.2d at 36; see also Bethlehem Area Sch. Dist, 807 A.2d at 852 (holding that a school district’s punishment of a student for creating a website at home during non-school hours was permissible). Accordingly, I do not believe the statute excludes school regulation of out-of-school conduct that threatens to materially interfere with the educational process.[7] Because the profile created a reasonably foreseeable substantial disruption of the Middle School, the School District did not exceed its statutory authority in punishing J.S.
C.
Our decision today causes a split with the Second Circuit. In applying Tinker, the Second Circuit has held that off-campus hostile and offensive student internet speech that is directed at school officials results in a substantial disruption of the classroom environment. In Wisniewski, a middle school student sent messages to fifteen fellow students via an instant messenger program from his home computer during non-school hours. 494 F.3d at 35-36. The program used an icon depicting one of his teachers being shot in the head with text below reading “Kill Mr. Vander-Molen.” Id. The Second Circuit stated that “off-campus conduct can create a foreseeable risk of substantial disruption within a school,” id. at 39 (citing Thomas v. Board of Education, 607 F.2d 1043, 1052 n. 17 (2d Cir.1979)), and held that it was reasonably foreseeable that the depiction would come to the attention of school authorities and the teacher who was the subject of the drawing. Id. at 39-40. The court reasoned that:
The potentially threatening content of the icon and the extensive distribution of it, which encompassed 15 recipients, including some of Aaron’s classmates, during a three-week circulation period, made this risk at least foreseeable to a reasonable person, if not inevitable. And there can be no doubt that the icon, once made known to the teacher and other school officials, would foreseeably create a risk of substantial disruption within the school environment.
Id. The Second Circuit held that hostile and offensive off-campus student speech posed a reasonably foreseeable threat of substantial disruption within the school. Id.
The Second Circuit confronted a similar scenario in Doninger v. Niehoff, 527 F.3d 41 (2d Cir.2008) (Doninger I) and Doninger v. Niehoff, 642 F.3d 334, 2011 WL 1532289 (2d Cir. April 25, 2011) (.Doninger II). A member of the high school student council, upset by scheduling conflicts regarding a student event, posted a message on her blog from her home computer during non-school hours. She stated that the student event was “cancelled due to douchebags in the central office.” Doninger I, 527 F.3d at 45. She urged people to call or write a school official “to piss her off more.” Id. The school received numer *951 ous calls and emails, some of which were from students who were upset. As a result of the blog post, the school refused to allow the student to run for Junior Class Secretary. The student challenged the school’s sanction, but the Second Circuit stated that the student’s post, “although created off-campus, was purposely designed by [the student] to come onto the campus.” Doninger I, 527 F.3d at 50. The Court reasoned that her post “foreseeably createfd] a risk of substantial disruption within the school environment.” Id. at 50. It was reasonably foreseeable that “administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate misguided anger or confusion over [the student event’s] purported cancellation.” Id. at 51-52.
The majority claims that these cases are distinguishable. It argues that no one could have taken J.S.’s accusations seriously and that “J.S. did not even intend for the speech to reach the school.” Maj. Op. at 930. The majority misses the mark. As discussed above, J.S.’s post was at least potentially psychologically harmful to McGonigle and Frain, it was vicious in its accusations of sexual misconduct, and it posed the potential to undermine McGonigle’s authority at the Middle School and to divert School resources in tempering the inevitable anger and confusion amongst parents and the community following a public accusation of sexual misconduct. It is of no consequence if J.S. in fact did not intend to reach the Middle School. She directed obscene and harmful speech at McGonigle and his family, disseminated it to members of the School, and made unfounded accusations. For these reasons, it was reasonably foreseeable that her speech would cause a substantial disruption of the educational process and the classroom environment. And it is on this point that the majority parts ways with the Second Circuit.
The majority’s approach does not offer a promising way forward. Internet use among teenagers is nearly universal. See Amanda Lenhart, et al, Pew Internet & American Life Project: Teens and Social Media 2 (2007) (stating that 93 percent of teenagers use the internet and 61 percent use it daily). And social networking sites have become one of the main vehicles of social interaction. See Amanda Lenhart, et al., Pew Internet and American Life: Teens and Mobile Phones 59 (2010) (stating that 73 percent of teenagers use a social networking site); National School Board Association, Creating & Connecting: Research and Guidelines on Online Social — And Educational — Networking (2007) (stating that teenagers spend an average of 9 hours per week on social networking sites).
The line between “on-campus” and “off-campus” speech is not as clear as it once was. Today, students commonly carry cell phones with internet capabilities onto school grounds. Approximately 66 percent of students receive a cell phone before the age of 14, and slightly less than 75 percent of high school students have cell phones. Amanda Lenhart, et al., Pew Internet and American Life: Teens and Mobile Phones 9 (2010). Twenty-three percent of teenagers between the ages of 12 and 17 who own cell phones use them to access social networking sites like MySpace and Facebook. Id. at 56. The majority embraces a notion that student hostile and offensive online speech directed at school officials will not reach the school. But with near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is reasonable to anticipate an *952 impact on the classroom environment. I fear that our Court has adopted a rule that will prove untenable.
III.
I concur in the Court’s decision that the School District did not violate J.S.’s parents’ rights under the Fourteenth Amendment to raise their child in the manner which they saw fit as discussed in Part IV of the majority opinion, and I concur in the decision that the School District’s policies were not unconstitutionally overbroad and vague as discussed in Part V of the majority opinion.
But I respectfully dissent from the decision that the suspension of J.S. for making false and malicious accusations against her principal in the form of lewd and offensive speech violated her First Amendment rights. In student free speech cases, courts must grapple with the issue of promoting freedom of expression while maintaining a conducive learning environment. I believe the majority has unwisely tipped the balance struck by Tinker, Fraser, Kuhlmeier, and Morse, thereby jeopardizing schools’ ability to maintain an orderly learning environment while protecting teachers and school officials against harmful attacks.

. Today, our Court releases a separate opinion dealing with school discipline of a student who created a MySpace profile of his principal. See Layshock v. Hermitage Sch. Dist., 650 F.3d 205 (3d Cir.2011) (en banc). However, I find the two cases distinguishable. Unlike the instant case, the school district in Layshock did not argue on appeal that there was, under Tinker, a nexus between the student’s speech and a substantial disruption of the school environment. Id. at Part IV.2. This nexus, under Tinker, is the basis of my dissent in this case. The Court in Layshock also holds, under Fraser, that the student’s speech could not be considered “on-campus’’ speech just because it was targeted at the Principal and other members of the school community and it was reasonably foreseeable that school district and Principal would learn about the MySpace profile. Id. at Part IV.3. Layshock's holding, therefore, does not speak to the facts of this case to which I believe Tinker applies.

. Romberger stated that she did not disclose any of the allegations in the profile because she believed it consisted of "lies” and "malicious comments” made by students angry at McGonigle.

. It is worth noting that these forms of online personal attacks by students occur with some degree of frequency. They are often directed at other students and have been called "cyberbullying.” In a 2010 study, 20.8 percent of students ages 10 to 18 years old stated that they had been "cyberbullied” in their lifetime, and 7.5 percent stated that they were "cyberbullied” within the previous 30 days, where "cyberbullying” was defined as "when someone repeatedly harasses, mistreats, or makes fun of another person online or while using cell phones or other electronic devices.” Sameer Hinduja & Justin W. Patchin, Cyberbullying Research Center, available at http:// www.cyberbullying.us/research.php. In a different study from 2007 — perhaps reflecting the nebulous concept of "cyberbullying” — 7 percent of students stated that they had been victims of "self-defined cyberbullying.” National School Board Association, Creating & Connecting: Research and Guidelines on Online Social — And Educational — Networking 6 (2007); see also M.I. Ybarra & J.K. Mitchell, Online Aggressor/Targets, Aggressors and Targets: A Comparison of Associated Youth Characteristics, 45 J. Child Psychol. & Psychiatry 1308 (2004) (19 percent of youth were on the giving or receiving end of online aggression in the previous year).

. My disagreement with the majority is principally with respect to its interpretation of the *948 facts. I am not in disagreement with the majority's assumption that Tinker applies to off-campus speech. We simply disagree about whether J.S.’s speech rises to the level of a substantial disruption. By sharp contrast, the concurring opinion by Judge Smith embraces the position that Tinker does not apply to off-campus speech. The concurring judges state that off-campus student speech should receive the same protections as adult speech "in the community at large.” Cone. Op. at 936. While certainly a defensible position, I find it unpersuasive. Student speech that targets school officials, is publicly broadcasted to the school community, and has a reasonably foreseeable substantial disruption on the classroom environment is regulable by schools, whether it occurs on- or off-campus. The regulation of J.S.'s speech was grounded in "the special characteristics of the school environment,” Tinker, 393 U.S. at 506, 89 S.Ct. 733, because it served the purposes of preserving the authority and respect of school officials, averting the need to utilize school resources to correct misinformation and remedy confusion, and protecting school officials against the psychological effects of student harassment. The concurring judges advocate for an artificial distinction that belies the fact that off-campus student speech can have a very real impact on the classroom environment.

. Even if J.S.'s intent were at issue, it is not so clear that the profile was intended to be a joke. While she at one point stated that the profile was created for comical reasons, J.S. also stated that she created the profile because she was "mad” at McGonigle for disciplining her. She claimed that McGonigle unnecessarily yelled at her for committing dress code violations. It is therefore fair to say that J.S. created the profile in retaliation.

. Similarly, even though the majority might have reached a different conclusion on these facts, it certainly cannot be said that the School District acted unreasonably by suspending J.S. for ten days. Cf. Morse, 551 U.S. at 398, 409-10, 127 S.Ct. 2618 (affirming ten- *949 day suspension of student who displayed a banner encouraging illegal drug use at a school event). Indeed, the reasonableness of the School District’s response to J.S.’s behavior further distinguishes this case from Layshock, where, in addition to being suspended for ten days, the student was (1) transferred to a special academic program for “students with behavior and attendance problems who are unable to function in a regular classroom,” (2) banned from all extracurricular activities, and (3) prohibited from participating in his graduation ceremony. See Layshock, Part I & n. 6.

. I also believe it is improper to read § 5-510 as an exhaustive description of all occasions under which school officials are statutorily authorized to punish students for infractions of school policies.