PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-4465

JUSTIN LAYSHOCK, a minor,
by and through his parents;
DONALD LAYSHOCK;
CHERYL LAYSHOCK, individually
and on behalf of their son

v.

HERMITAGE SCHOOL DISTRICT
KAREN IONTA, District Superintendent;
ERIC W. TROSCH, Principal Hickory High School,
CHRIS GILL, Co-Principal Hickory High School, all in their
official and individual capacity

Hermitage School District,
Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(Civ. No. 06-cv-00116)
District Judge: Hon. Terrence F. McVerry

Argued on December 10, 2008

1

Opinion Filed on February 4, 2010
Opinion Vacated and Petition for Rehearing En Banc
Granted on April 9, 2010
Rehearing En Banc Ordered for June 3, 2010
Argued En Banc on June 3, 2010

Before: McKEE, *Chief Judge*, SLOVITER, SCIRICA,
RENDELL, BARRY,
AMBRO, FUENTES, SMITH, FISHER, CHAGARES,
JORDAN,
GREENAWAY, JR. VANASKIE and ROTH, *Circuit Judges*.

(Opinion filed: June 13, 2011)

ANTHONY G. SANCHEZ, ESQ.  (Argued)
CHRISTINA LANE, ESQ.
Andrews & Price
1500 Ardmore Boulevard, Suite 506
Pittsburgh, PA 15221
*Attorneys for Appellant, Hermitage School District*

SEAN A. FIELDS, ESQ.
Associate Counsel
Pennsylvania School Boards Association
400 Bent Creek Boulevard
P.O. Box 2042
Mechanicsburg, PA 17055
*Attorney for Amicus Curiae, Pennsylvania School
Board Association, filed in support of Appellant,
Hermitage School District*
KIM M. WATTERSON, ESQ.

RICHARD T. TING, ESQ.
WILLIAM J. SHERIDAN, ESQ.
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

WITWOLD J. WALCZAK, ESQ. (Argued)
SARA J. ROSE, ESQ.
American Civil Liberties Foundation
of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
*Attorneys for Appellees, Donald Layshock,*
*Cheryl Layshock*

JOHN W. WHITEHEAD, ESQ.
The Rutherford Institute
1440 Sachem Place
Charlottesville, VA 22901
*Attorney for Amicus Curiae, The Rutherford*
*Institute, in support of Appellees,*
*Donald Layshock, Cheryl Layshock*

JOANNA J. CLINE, ESQ.
BRIAN A. BERKLEY, ESQ.
JOSHUA B. HIRSHEY, ESQ.
EMMETT M. HOGAN, ESQ.
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

3

FRANK D. LoMONTE, ESQ.
MICHAEL C. HIESTAND, ESQ.
ADAM GOLDSTEIN, ESQ.
The Student Press Law Center
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209
*Attorneys for Amicus Curiae, The Student Press Law Center, in support of Appellees, Donald Layshock, Cheryl Layshock*

ROBERT D. RICHARDS, ESQ.
CLAY CALVERT, ESQ.
Pennsylvania Center for the
First Amendment
The Pennsylvania State University
308 James Building
University Park, PA 16802
*Attorneys for Amicus Curiae, Pennsylvania Center for the First Amendment, in support of Appellees, Donald Layshock, Cheryl Layshock*

## OPINION OF THE COURT

McKEE, *Chief Judge*.

We are asked to determine if a school district can punish a student for expressive conduct that originated outside of the schoolhouse, did not disturb the school environment and was not related to any school sponsored event. We hold that, under these circumstances, the First Amendment prohibits the school from

4

reaching beyond the schoolyard to impose what might otherwise be appropriate discipline.

It all began when Justin Layshock used his grandmother's computer to access a popular social networking internet web site where he created a fake internet "profile" of his Hickory High School Principal, Eric Trosch. His parents filed this action under 42 U.S.C. § 1983, after the School District punished Justin for that conduct. The suit alleges, *inter alia*, that the School District's punishment transcended Justin's First Amendment right of expression. The district court granted summary judgment in favor of Justin on his First Amendment claim. We originally affirmed the district court. *See Layshock v. Hermitage School Dist.,* 593 F.3d 249 (3d Cir. 2010). Thereafter, we entered an order vacating that opinion and granting rehearing en banc. For the reasons that follow, we once again affirm the district court's holding that the school district's response to Justin's conduct transcended the protection of free expression guaranteed by the First Amendment.

## I. FACTUAL BACKGROUND

In December of 2005, Justin Layshock was a seventeen-year old senior at Hickory High School, which is part of the Hermitage School District in Hermitage, Pennsylvania. Sometime between December 10th and 14th, 2005, while Justin was at his grandmother's house during non-school hours, he used her computer to create what he would later refer to as a "parody profile" of his Principal, Eric Trosch. The only school resource that was even arguably involved in creating the profile

5

was a photograph of Trosch that Justin copied from the School District's website. Justin copied that picture with a simple "cut and paste" operation using the computer's internet browser and mouse. Justin created the profile on "MySpace."[1] MySpace is a popular social-networking website that "allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests." *Doe v. MySpace, Inc.*, 474 F.Supp. 2d 843, 845 (W.D. Tex. 2007).[2]

Justin created the profile by giving bogus answers to survey questions taken from various templates that were designed to assist in creating a profile. The survey included questions about favorite shoes, weaknesses, fears, one's idea of a "perfect pizza," bedtime, etc. All of Justin's answers were based on a theme of "big," because Trosch is apparently a large man. For example, Justin answered "tell me about yourself" questions as follows:

---

[1] MySpace is found at: http://www.myspace.com.

[2] Social online networking sites allow members to use "their online profiles to become part of an online community of people with common interests. Once a member has created a profile, she can extend 'friend invitations' to other members and communicate with her friends over the MySpace.com platform via e-mail, instant messaging, or blogs." *Doe*, 474 F. Supp.2d at 846.

Birthday: too drunk to remember

Are you a health freak: big steroid freak

In the past month have you smoked: big blunt[3]

In the past month have you been on pills: big pills

In the past month have you gone Skinny Dipping: big lake, not big dick

In the past month have you Stolen Anything: big keg

Ever been drunk: big number of times

Ever been called a Tease: big whore

Ever been Beaten up: big fag

Ever Shoplifted: big bag of kmart

---

[3]Justin explained that a "blunt" was a marijuana cigarette.

7

Number of Drugs I have taken: big

Under "Interests," Justin listed: "Transgender, Appreciators of Alcoholic Beverages."  Justin also listed "Steroids International" as a club Trosch belonged to.

Justin afforded access to the profile to other students in the School District by listing them as "friends" on the MySpace website, thus allowing them to view the profile.  Not surprisingly, word of the profile "spread like wildfire" and soon reached most, if not all, of Hickory High's student body.[4]

During mid-December 2005, three other students also posted unflattering profiles of Trosch on MySpace.  Each of those profiles was more vulgar and more offensive than Justin's.  Trosch first learned about one of the other profiles from his daughter, who was in eleventh grade.  On Monday, December 12, 2005, Trosch told his Co-Principal, Chris Gill, and the District Superintendent, Karen Ionta, about this other profile and asked the Technology Director, Frank Gingras, to disable it.  However, despite the administration's best efforts, students found ways to access the profiles.  Trosch discovered Justin's profile on Thursday evening, December 15th, and a fourth profile on Sunday, December 18th.

---

[4] Justin later explained that he made the profile to be funny, and did not intend to hurt anyone.  However, there was obviously nothing "funny" about the profile in the eyes of the school administration.

8

Trosch believed all of the profiles were "degrading," "demeaning," "demoralizing," and "shocking." He was also concerned about his reputation and complained to the local police. Although he was not concerned for his safety, he was interested in pressing charges against those responsible for the bogus profiles, and he discussed whether the first profile he discovered might constitute harassment, defamation, or slander. However, no criminal charges were ever filed against Justin or any of the other student authors of profiles.

On December 15th, Justin used a computer in his Spanish classroom to access his MySpace profile of Trosch. He also showed it to other classmates, although he did not acknowledge his authorship. After viewing the profile, the students logged off of MySpace. Justin again attempted to access the profile from school on December 16th, purportedly to delete it. School district administrators were unaware of Justin's in-school attempts to access MySpace until their investigation the following week. Teacher Craig Antush glimpsed the profile in his computer lab class and told the students who were congregating around a computer and giggling to shut it down.

The School District administrators were not able to totally block students from visiting the MySpace web page at school because Gingras, the Technology Coordinator, was on vacation on December 16th. However, the school was able to control students' computer access by limiting the students' use of computers to computer labs or the library where internet access could be supervised. School officials continued to limit computer use from December 16th until December 21st, which was the last day of school before Christmas recess. Computer

9

programming classes were also cancelled.

According to the district court, the School District's investigation revealed how many students had accessed MySpace before access to the site at school was disabled, but the school could not determine how many students actually accessed any of the Trosch profiles, or which Trosch profiles had been viewed while a student was on the MySpace website.

School District officials first learned that Justin might have created one of the Trosch profiles on December 21. On that day, Justin and his mother were summoned to a meeting with Superintendent Ionta and Co-Principal Gill. During that meeting, Justin admitted creating a profile, but no disciplinary action was then taken against him. After the meeting, without prompting from anyone, Justin went to Trosch's office and apologized for creating the profile.[5]

Justin's parents were understandably upset over Justin's behavior. They discussed the matter with him, expressed their extreme disappointment, "grounded" him, and prohibited him from using their home computer.

On January 3, 2006, the school district sent a letter to Justin and his parents giving them notice of an informal hearing that was to be held. The letter read, in pertinent part, as follows:

---

[5] Trosch later testified that he found Justin's apology respectful and sincere. Justin followed up with a written letter of apology on January 4, 2006.

> Justin admitted prior to the informal hearing that he created a profile about Mr. Trosch.
>
> This infraction is a violation of the Hermitage School District Discipline Code: Disruption of the normal school process; Disrespect; Harassment of a school administrator via computer/internet with remarks that have demeaning implications; Gross misbehavior; Obscene, vulgar and profane language; Computer Policy violations (use of school pictures without authorization).

The School District subsequently found Justin guilty of all of those charges.

In addition to a ten-day, out-of-school suspension, Justin's punishment consisted of (1) being placed in the Alternative Education Program (the "ACE" program) at the high school for the remainder of the 2005-2006 school year;[6] (2)

---

[6]Students assigned to ACE meet in a segregated area of the high school for three hours each day. The program is typically reserved for students with behavior and attendance problems who are unable to function in a regular classroom.

Prior to creating the Myspace profile, Justin was

11

being banned from all extracurricular activities, including Academic Games and foreign-language tutoring;[7] and (3) not being allowed to participate in his graduation ceremony.[8] The Layshocks were also informed that the School District was considering expelling Justin. Ironically, Justin, who created the least vulgar and offensive profile, and who was the only student to apologize for his behavior, was also the only student punished for the MySpace profiles.

## II. DISTRICT COURT PROCEEDINGS

The Layshocks initiated this action on January 27, 2006, by filing a three count complaint pursuant to 42 U.S.C. § 1983 individually, and on Justin's behalf, against the Hermitage School District, Karen Ionta, Eric Trosch, and Chris Gill, in their official and individual capacities (hereinafter collectively referred to as the "School District" or "District"). The Layshocks also filed a motion for a temporary restraining order

---

classified as a gifted student, was enrolled in advanced placement classes, and had won awards at interscholastic academic competitions. The record does not reveal how the School District determined that it was appropriate to place such a student in a program designed for students who could not function in a classroom.

[7]Justin had been a French tutor to middle school students.

[8] Justin did graduate in 2006 and went on to attend a university in New York City.

and/or preliminary injunction. Count I of the complaint alleged that the District's punishment of Justin violated his rights under the First Amendment. Count II alleged that the District's policies and rules were unconstitutionally vague and/or overbroad, both on their face and as applied to Justin. Count III alleged that the District's punishment of Justin interfered with, and continued to interfere with, their right as parents to determine how to best raise, nurture, discipline and educate their child in violation of their rights under the Due Process Clause of the Fourteenth Amendment.

The district court denied the request for a temporary restraining order, *Layshock v. Hermitage Sch. Dist.*, 412 F. Supp.2d 502, 508 (W.D. Pa. 2006), and the Layshocks withdrew their motion for a preliminary injunction pursuant to the district court's efforts at mediation.[9] On March 31, 2006, the district court denied the District's motion to dismiss the Layshocks' claims. The court ruled that the parents may assert a claim for a violation of their own due process right to "raise, nurture, discipline and educate their children" based on a school district's punishment of their child for speech the child uttered in the family home.

After discovery, both sides moved for summary

---

[9] The Layshocks agreed to withdraw their motion for a preliminary injunction in exchange for the District's agreement to remove Justin from the ACE program, reinstate him to his regular classes, allow him to participate in Academic Games, and attend his graduation.

judgment, and the court thereafter entered summary judgment in favor of Justin and against the School District only on the First Amendment claim.[10] The court concluded that a jury trial was necessary to determine compensatory damages and attorneys' fees. *See id.* at 607.

Thereafter, the district court denied the District's motion for entry of judgment pursuant to Fed.R.Civ.P. 54(b) or, in the alternative, for the issuance of a certificate of appealability pursuant to 28 U.S.C. § 1292(b).

---

[10] The district court ruled that Trosch was entitled to summary judgment on all counts because he was not involved in disciplining Justin. It also held that Ionta and Gill were entitled to summary judgment on Justin's First Amendment claim based on qualified immunity, and that all of the defendants were entitled to summary judgment on the vagueness/overbreadth challenge and the parents' substantive due process claim.

The parties subsequently filed a joint motion in which they stipulated to damages and requested entry of final judgment while preserving all appellate issues pertaining to liability. The district court then entered a consent judgment, and the School District appealed the district court's grant of summary judgment in favor of Justin on his First Amendment claim.[11]

## III. SUMMARY JUDGMENT

"Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 268 (3d Cir. 2008) (citation and internal quotation marks omitted). In ruling on a motion for summary

[11]The Layshocks filed a cross-appeal (No. 07-4555) from the district court's grant of summary judgment in favor of the School District on their Fourteenth Amendment Due Process claim. In our opinion filed on February 4, 2010, we affirmed the district court's grant of summary judgment to the School District on that claim, and the Layshocks did not seek rehearing en banc on that claim. Therefore, although we vacated the February 4, 2010, opinion and judgment as to the School District's appeal at No. 07-4464, and granted the School District's petition for rehearing en banc, we also, on April 9, 2010, ordered that "the opinion and judgment entered by this Court on February 4, 2010 stands with respect to the affirmance of the district court's grant of summary judgment to the [School District] on [the Layshocks'] Fourteenth Amendment Due Process claim."

15

judgment, the district court must view the facts in the light most favorable to the non-moving party. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "As our review of a grant of summary judgment is plenary, we operate under the same legal standards as the District Court." *Bjorgung*, 550 F.3d at 268.

## IV. DISCUSSION
### 1. The First Amendment's Application in Public Schools.

In the landmark case of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), a group of high school students decided to wear black arm bands to school to protest the war in Vietnam. When school officials learned of the planned protest, they preemptively prohibited students from wearing armbands. Several students who ignored the ban and wore armbands to school anyway were suspended. *Id.* at 504. Those students brought an action against the school through their parents under 42 U.S.C. § 1983, alleging that their First Amendment rights had been violated. The district court rejected that claim and upheld the constitutionality of the school officials' action, finding that it had been reasonable to preserve discipline. *Id*. 504-505. The district court's decision was affirmed without opinion by an equally divided court of appeals sitting *en banc. Id*. at 505.

The case was appealed to the Supreme Court, which held that student expression may not be suppressed unless school

16

officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Id*. at 513. The Court concluded that the students were doing nothing more than engaging in political speech, and wearing armbands to express "their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Id*. at 514. The school district's only interest in banning the speech had been the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" or "an urgent wish to avoid the controversy which might result from the expression." *Id*. at 509-10. The Court held that this interest was not enough to justify banning "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id*. at 508. In one of its most famous passages, the Court explained:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

*Id*. at 506.

Thus, although the Court concluded that the First Amendment did reach inside the "schoolhouse gate," it also recognized that the unique nature of the school environment had to be part of any First Amendment inquiry. The Court explained that it "ha[d] repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials,

17

consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id*. at 507.

The Court next addressed the scope of the First Amendment in the context of student speech in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986). There, the Court upheld the school's suspension of a high school student for delivering a nominating speech at a school assembly using "an elaborate, graphic, and explicit sexual metaphor." *Id*. at 678. The Court explained:

> The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by [Fraser].[12]

*Id*. at 683. In reaching this conclusion, the Court distinguished its prior holding in *Cohen v. California*, 403 U.S. 15 (1971). There, the Court had struck down an adult's conviction for disorderly conduct that was based on his wearing a jacket, inside a court house, that had an obscenity about the draft printed on it.

---

[12]In *Saxe v. State College Area School District*, 240 F.3d 200, 213 (3d Cir. 2001), we interpreted *Fraser* as establishing that "there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech in school."

18

The *Fraser* Court explained:

> It does not follow . . . that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in public school. . . . [T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.

*Id.* at 682 (citation and internal quotation marks omitted). The Court concluded that the school could punish Fraser for his offensive nominating speech during a school assembly because the First Amendment does not prevent schools from encouraging the "fundamental values of 'habits and manners of civility,'" *id.* at 681, by "insisting that certain modes of expression are inappropriate and subject to sanctions." *Id.* at 683. Thus, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id.*

Similarly, in *Hazelwood School District. v. Kuhlmeier*, 484 U.S. 260 (1988), the Court held that a principal's deletion of student articles on teen pregnancy from a school-sponsored newspaper did not violate the First Amendment. The Court distinguished *Tinker* by noting that because the school had not opened the newspaper up as a public forum, the school could

19

"exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as [its] actions are reasonably related to legitimate pedagogical concerns." *Id*. at 273. The Court explained:

> The question whether the First Amendment requires a school to tolerate particular student speech – the question that we addressed in *Tinker* – is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored . . . expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. . . . Educators are entitled to exercise greater control over this second form of student expression.

*Id*. at 270-71.

The extent to which First Amendment protections apply

20

in the public school context was most recently addressed in *Morse v. Frederick*, 551 U.S. 393 (2007). There, "[a]t a school-sanctioned and school-supervised event, a high school principal [Morse] saw some of her students unfurl a large banner conveying a message she reasonably regarded as promoting illegal drug use." *Id*. at 396. The banner read: "BONG HiTS 4 JESUS." *Id*. at 397. "Consistent with established school policy prohibiting such messages at school events, [Morse] directed the students to take down the banner." *Id*. at 396. Frederick, one of the students who brought the banner to the event, refused to remove it, and Morse "confiscated the banner and later suspended [Frederick]." *Id*. Frederick sued Morse and the school district pursuant to 42 U.S.C. § 1983, alleging a violation of his First Amendment right of expression. The district court granted summary judgment to the school district and Morse, holding that they were entitled to qualified immunity and that they had not infringed Frederick's First Amendment rights. *Id*. at 399. The Court of Appeals for the Ninth Circuit reversed.

The Supreme Court granted certiorari to determine "whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages." *Id*. at 400.[13] The Court "resolve[d] the first question against Frederick," and, therefore, did not have to reach the second. *Id*. The Court explained that its Fourth Amendment jurisprudence recognized that "deterring drug use by school children is an important –

---

[13] The court of appeals had ruled that the principal was not entitled to qualified immunity.

21

indeed, perhaps compelling interest." *Id.* at 407 (citation omitted). The "special characteristics of the school environment, and the governmental interest in stopping student drug abuse allow schools to restrict student expression that they reasonably regard as promoting such abuse." *Id*. at 408. Thus, "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id*. at 402. The Court rejected Frederick's claim that since he was across the street from the school and not on school property, he was not inside *Tinker*'s "schoolhouse gate," and school officials therefore had lost authority over him. The Court reasoned that the event where the banner was unfurled occurred during school hours, and it had been approved by the school's principal as a school event. *Id*. at 400. School events and field trips off school grounds were subject to the school's rules for student conduct. *Id*. at 400-01.

It is against this legal backdrop that we must determine whether the District's actions here violated Justin's First Amendment rights.

At the outset, it is important to note that the district court found that the District could not "establish[] a sufficient nexus between Justin's speech and a substantial disruption of the school environment[,]" *Layshock*, 496 F. Supp. 2d at 600, and the School District does not challenge that finding on appeal. Therefore, the School District is not arguing that it could properly punish Justin under the *Tinker* exception for student speech that causes a material and substantial disruption of the school environment. *See Tinker*, 393 U.S. at 513. Rather, the

22

District's argument is twofold:

> [A] sufficient nexus exists between Justin's creation and distribution of the vulgar and defamatory profile of Principal Trosch and the School District to permit the School District to regulate this conduct. The "speech" initially began on-campus: Justin entered school property, the School District web site, and misappropriated a picture of the Principal. The "speech" was aimed at the School District community and the Principal and was accessed on campus by Justin. It was reasonably foreseeable that the profile would come to the attention of the School District and the Principal.

District's Br. at 9.

## 2. Justin's "Entry" Onto the District's Website.

The School District's attempt to forge a nexus between the School and Justin's profile by relying upon his "entering" the District's website to "take" the District's photo of Trosch is unpersuasive at best. The argument equates Justin's act of signing onto a web site with the kind of trespass he would have committed had he broken into the principal's office or a

23

teacher's desk; and we reject it.  *See Thomas v. Board of Educ.*, 607 F.2d 1043 (2d Cir. 1979).

We find the reasoning in *Thomas v. Board of Educ.*, 607 F.3d 1043 (2d Cir. 1979), far more persuasive.[20]  *Thomas* involved a group of students who were suspended for producing "a satirical publication addressed to the school community." *Id.* at 1045.  The articles included such topics as masturbation and prostitution, as well as more standard fare such as "school lunches, cheerleaders, classmates, and teachers." *Id.*  "Some of the initial preparation for publication occurred after school hours in the classroom" of a teacher whom the students consulted "for advice on isolated questions of grammar and content." *Id.*   In addition, "an occasional article was composed or typed within the school building, always after classes," and the finished magazine was stored in a "classroom closet" with the classroom teacher's permission.  *Id.*

---

[20]*Thomas* was decided after *Tinker* but before *Fraser*.

However, the students were very careful to distribute the periodical only after school and off campus, and the vast majority of their work on the publication was done "in their homes, off campus and after school hours." *Id.* The school principal learned of the magazine when a teacher confiscated a copy from another student on campus, and "following consultation with the Board of Education," the principal imposed penalties that included a five-day suspension of the students involved.[21] *Id*. at 1046. The punishment was based on the students' publication of "an allegedly 'morally offensive, indecent, and obscene,' tabloid." *Id*. at 1050 n.12.

The students sued the school board and other school officials under 42 U.S.C. § 1983. They sought "injunctive and declaratory relief from alleged deprivations of their First and Fourteenth Amendment rights." *Id*. at 1046. The district court denied the students' request for injunctive relief based upon its conclusion that the publication "was potentially destructive of discipline in [the school], and therefore not protected by the First Amendment." *Id*. at 1047.

The Court of Appeals for the Second Circuit concluded that the students' conduct was not sufficiently related to the school to justify the school's exercise of authority. The court

---

[21] The Principal and Superintendent of Schools had initially decided to take no action pending assessment of the publication's impact. However, they ultimately decided to act after being contacted by the President of the Board of Education. *Thomas*, 607 F.2d at 1045-46.

explained:

> [A]ll but an insignificant amount of relevant activity in this case was deliberately designed to take place beyond the schoolhouse gate. Indeed, the [students] diligently labored to ensure that [the magazine] was printed outside the school, and that no copies were sold on school grounds. That a few articles were transcribed on school typewriters, and that the finished product was secretly and unobtrusively stored in a teacher's closet do not alter the fact that [the magazine] was conceived, executed, and distributed outside the school. At best, therefore, any activity within the school itself was De minimis.

*Id*. at 1050.

The court reached that conclusion even though the students actually stored the offending publication inside a classroom and did some minimal amount of work on the periodical in school using school resources. Here, the relationship between Justin's conduct and the school is far more attenuated than in *Thomas.* We agree with the analysis in *Thomas.* Accordingly, because the School

26

District concedes that Justin's profile did not cause disruption in the school, we do not think that the First Amendment can tolerate the School District stretching its authority into Justin's grandmother's home and reaching Justin while he is sitting at her computer after school in order to punish him for the expressive conduct that he engaged in there.

We realize, of course, that it is now well established that *Tinker*'s "schoolhouse gate" is not constructed solely of the bricks and mortar surrounding the school yard. Nevertheless, the concept of the "school yard" is not without boundaries and the reach of school authorities is not without limits. In *Morse*, the Court held that the First Amendment does not prevent a principal from "restrict[ing] student speech *at a school event*, when that speech is reasonably viewed as promoting illegal drug use." 551 U.S. at 403 (emphasis added). Nevertheless, with regard to expressive conduct that occurs outside of the school context, the Court, referring to its earlier decision in *Fraser*, was careful to note that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 404 (citations omitted).

It would be an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities. Allowing the District to punish Justin for conduct he engaged in while at his grandmother's house using his

27

grandmother's computer would create just such a precedent, and we therefore conclude that the district court correctly ruled that the District's response to Justin's expressive conduct violated the First Amendment guarantee of free expression.

### 3. The District Cannot Punish Justin Merely Because His Speech Reached Inside the School.

As noted above, the School District also claims that Justin's speech can be treated as "on-campus" speech because it "was aimed at the School District community and the Principal and was accessed on campus by Justin [and] [i]t was reasonably foreseeable that the profile would come to the attention of the School District and the Principal."

The district court held that the School District's punishment of Justin was not appropriate under *Fraser* because "[t]here is no evidence that Justin engaged in any lewd or profane speech while in school." *Layshock*, 496 F. Supp.2d at 599-600. It also held that Justin's punishment was not appropriate under *Tinker* because the School District did "not establish[] a sufficient nexus between Justin's speech and a substantial disruption of the school environment." *Id.* at 600.

The School District does not dispute the district court's finding that its punishment of Justin was not appropriate under *Tinker*; it rests its argument on the Supreme Court's analysis in *Fraser.* In the School District's view, Justin's speech – his MySpace profile of Trosch – was unquestionably vulgar, lewd and offensive,

28

and therefore not shielded by the First Amendment because it ended up inside the school community.[22] Similarly, the School District argues that under our decision in *Saxe*, *see* n.12, *supra*, there is no First Amendment protection for lewd, vulgar, indecent or plainly offensive speech in schools.[23]

[22] The District's argument in this regard is not crystal clear as its brief suggests that it can react to Justin's profile merely because it was lewd and vulgar. For example, the District summarizes one of its arguments as follows:

> The School District did not violate the First Amendment by punishing Justin for engaging in conduct which interfered with the School District's "highly appropriate function . . . to prohibit the use of vulgar and offensive terms in public discourse."

District's Br. at 10 (ellipsis in original). However, we reject out of hand any suggestion that schools can police students' out-of-school speech by patrolling "the public discourse." Accordingly, we will assume that the District is arguing that it can control lewd and vulgar speech as authorized under *Fraser*.

[23] In *Saxe*, we did state: "Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language." 240 F.3d at 214. However, when read in context, it is clear that we were there referring only to speech inside *Tinker*'s schoolhouse gate. Thus, we summarized the holding in *Fraser* as follows: "According to *Fraser*, . . . there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech *in school*." *Id.* at 213 (emphasis added).

The District rests this argument primarily on three cases which it claims allow it to respond to a student's vulgar speech when that speech is posted on the internet. The District cites *J.S. v. Bethlehem Area Sch. Dist.*, 807 A.2d 847 (Pa. 2002); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007); and *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008). However, as we will explain, each of those cases involved off campus expressive conduct that resulted in a substantial disruption of the school, and the courts allowed the schools to respond to the substantial disruption that the student's out of school conduct caused.

In *J.S.*, an eighth grade student created a threatening website aimed at his algebra teacher that went so far as to explain "[w]hy Should She Die," and requested money "to help pay for the hitman." 807 A.2d at 851. The site frightened several students and parents and the algebra teacher was so badly frightened that she ended up having to take medical leave from her teaching responsibilities. As a result of her inability to return to teaching, "three substitute teachers were required to be utilized which disrupted the educational process of the students." *Id*. at 852. "In sum, the web site created disorder and significantly and adversely impacted the delivery of instruction." *Id*. at 869. The Supreme Court of Pennsylvania concluded that the resulting disruption of instruction and the educational environment allowed the school to punish the student for his expressive conduct even though the student created the website from his home.[24]

---

[24] The district court believed that *J.S.* was "on point" but "respectfully reache[d] a slightly different balance between

30

Similarly, the school suspended the student in *Wisniewski*, for creating an image on the internet from his home computer that depicted a pistol firing a bullet at a teacher's head with dots representing splattered blood above the head. 494 F.3d at 36. The words: "Kill Mr. VanderMolen" were printed beneath the drawing. VanderMolen was the student's English teacher. The student created the image a couple of weeks after his class was instructed that threats would not be tolerated at the school, and would be treated as acts of violence. The court of appeals affirmed the district court's grant of summary judgment in favor of the school district in a suit alleging a violation of the First Amendment based on the school's suspension of the student for the out-of-school conduct. The court reasoned that "[t]he fact that [the student's] creation and transmission of the icon occurred away from school property [did] not necessarily insulate him from school discipline." 494 F.3d at 39. The court reasoned that "even if [the student's] transmission of an [image] depicting and calling for the killing of his teacher could be viewed as an expression of opinion within the meaning of *Tinker*," it was not protected by the First Amendment because "it cross[ed] the boundary of protected speech and pose[d] a reasonably foreseeable risk [of] materially and substantially disrupting the work and discipline of the school." *Id.* at 38-9 (internal quotation marks omitted).

---

student expression and school authority." *Layshock*, 496 F. Supp. 2d at 602. However, we do not think *J.S.* is "on point" or the least bit helpful because there is no comparison between the impact of the conduct there and the impact of the conduct here.

31

Finally, in *Doninger*, a student, who was a class officer, posted a message on her publicly accessible web log or "blog" that resulted in school authorities not allowing her to participate in an election for class office.[25] *Id*. at 43.  In her message, she complained about a school activity that was cancelled "due to douchebags in central office," and encouraged others to contact the central office to "piss [the district superintendent] off more." *Id*. at 45. When the principal learned of the student's posting, she prohibited her from running for senior class secretary "because [the student's] conduct had failed to display the civility and good citizenship expected of class officers." *Id.* at 46.  The student and her parents then sought injunctive relief in the form of a court order allowing her to run for class office.  The court of appeals affirmed the district court's denial of relief because the student's out of school expressive conduct "created a foreseeable risk of substantial disruption to the work and discipline of the school." *Id*. at 53.[26]   " [The student] herself

---

[25]"A blog (a contraction of the term 'web log') is a type of website, usually maintained by an individual with regular entries or commentary, descriptions of events, or other material such as graphics or video. . . .  'Blog' can also be used as a verb, *meaning to maintain or add content to a blog*." (http://en.wikipedia.org/wiki/Blog) (last visited September 23, 2010).

[26] The blog had resulted in numerous calls and emails to the principal, and the court of appeals noted that the blog also used inaccurate and misleading information to rally those who read it to contact the school principal.

32

testified that . . . students were 'all riled up' and that a sit-in was threatened." *Id.* at 51. Accordingly, the court of appeals held that the student's mother "failed to show clearly that [the student's] First Amendment rights were violated when she was disqualified from running" for class office. *Id.* at 53.

However, for our purposes, it is particularly important to note that the court in *Doninger* was careful to explain that it "[had] no occasion to consider whether a different, more serious consequence than disqualification from student office would raise constitutional concerns." *Id.* at 53. Of course, Justin's consequences were more serious; he was suspended. Moreover, in citing *Doninger*, we do not suggest that we agree with that court's conclusion that the student's out of school expressive conduct was not protected by the First Amendment there. Rather, we cite *Doninger* only to respond to the School District's contention that that case supports its actions against Justin.

As noted earlier, the District's January 3, 2006, letter to the Layshocks advising them of Justin's suspension reads, in relevant part, that it was punishing Justin because "Justin admitted prior to the informal hearing that he created a profile about Mr. Trosch." Although the letter also mentions disruption, we have taken care to stress that the District does not now challenge the district court's finding that Justin's conduct did not result in any substantial disruption. Moreover, when pressed at oral argument, counsel for the School District conceded that the District was relying solely on the fact that Justin created the profile of Trosch, and not arguing that it created any substantial disruption in the school. However, as noted above, *Fraser* does

33

not allow the School District to punish Justin for expressive conduct which occurred outside of the school context. *See Morse*, 551 U.S. at 404 ("Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected.") (citations omitted). Moreover, we have found no authority that would support punishment for creating such a profile unless it results in foreseeable and substantial disruption of school.

We believe the cases relied upon by the School District stand for nothing more than the rather unremarkable proposition that schools may punish expressive conduct that occurs outside of school, as if it occurred inside the "schoolhouse gate," under certain very limited circumstances, none of which are present here.

As the court of appeals explained in *Thomas*: "[O]ur willingness to defer to the schoolmaster's expertise in administering school discipline rests, in large measure, upon the supposition that the arm of authority does not reach beyond the schoolhouse gate." 607 F.2d at 1045. We need not now define the precise parameters of when the arm of authority can reach beyond the schoolhouse gate because, as we noted earlier, the district court found that Justin's conduct did not disrupt the school, and the District does not appeal that finding. Thus, we need only hold that Justin's use of the District's web site does not constitute entering the school, and that the District is not empowered to punish his out of school expressive conduct under the circumstances here.

Based on those two conclusions, we will affirm the

34

district court's grant of summary judgment to Justin Layshock on his First Amendment claim.[27]

JORDAN, *Circuit Judge*, concurring, with whom VANASKIE, *Circuit Judge*, joins.

Our Court today issues en banc decisions in two cases with similar fact patterns. In both the case presently before us and in *J.S. v. Blue Mountain School District*, No. 08-4138, we are asked whether school administrators can, consistent with the First Amendment, discipline students for speech that occurs off campus.[14] Unlike the fractured decision in *J.S.*, we have reached a united resolution in this case, but there remains an

---

[27]The District argues in the alternative that it did not violate the First Amendment by punishing Justin because his speech was defamatory and not protected by the First Amendment. The Layshocks respond by arguing that Justin's profile is a parody that cannot constitute defamation. However, whether or not we accept the characterization of a "parody," the issue before us is limited to whether the District had the authority to punish Justin for expressive conduct outside of school that the District considered lewd and offensive.

[14] This case and *J.S.* are not related cases in the sense of being linked on our docket, but they raise nearly identical First Amendment issues. It is no accident that they were taken en banc at the same time, were argued on the same date, and are being decided simultaneously.

issue of high importance on which we are evidently not agreed and which I note now, lest there be any misperception that it has been resolved by either *J.S.* or our decision here. The issue is whether the Supreme Court's decision in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969), can be applicable to off-campus speech. I believe it can, and no ruling coming out today is to the contrary.[15]

In *Tinker*, the Supreme Court emphasized that student speech, "in class or out of it, which for any reason … materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. It also suggested that if there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," that too can result in disciplinary measures. *Id.* at 514. Given those statements, the applicability of *Tinker* here seems straightforward, although it gives no shelter to the defendant school district in this case because, as the opinion for our Court notes,

---

15 I readily acknowledge that "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents" *Morse v. Frederick*, 551 U.S. 393, 401 (2007), and my conclusion about *Tinker*'s applicability in this case and in *J.S.* does not account for permutations that may make *Tinker* inapposite. Whether the test framed by *Tinker* will always be applicable is not a matter to be answered in the abstract. It is enough for present purposes to observe that it is an analytical approach the Supreme Court has employed for decades and that it is both sensible and salutary to apply it in cases like these.

"the [Hermitage School] District does not now challenge the … finding that [the student's] conduct did not result in any substantial disruption[,]" Slip Op. at 33, nor did the School District demonstrate that the student's speech or conduct created a reasonable apprehension of substantial disruption.

*Tinker* ought likewise to be viewed as providing the governing rule of law in *J.S.*, but that has been thrown into question by the competing opinions that have emerged in en banc review. The Majority opinion in *J.S.* takes the position that whether *Tinker* is applicable to off-campus speech is something that can be assumed without being decided since, in the Majority's view, there was no substantial disruption and hence the school administrators could not lawfully mete out discipline for the despicable speech and behavior detailed in that case. Judge Smith's concurring opinion in *J.S.* argues that *Tinker* does not apply. He appears to conclude that, with the exceptions of speech specifically directed at the school and of speech while at school-sanctioned events, speech that takes place off-campus is beyond the reach of school discipline. *See J.S.* Concurrence, slip op. at 3-4. The concurrence does acknowledge, however, that whether *Tinker* applies "cannot turn solely on where the speaker was sitting when the speech was originally uttered[,]" because "[s]uch a standard would fail to accommodate the somewhat 'everywhere at once' nature of the internet[,]" *id.* at 8. Judge Fisher then skillfully demonstrates in his dissent in *J.S.*, that the heavy focus in the concurrence on an "off-campus versus on-campus" distinction is artificial and untenable in the world we live in today. *See J.S.* Dissent, slip op. at n.4. For better or worse, wireless internet access, smart phones, tablet computers, social networking services like Facebook, and

37

stream-of-consciousness communications via Twitter give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools.

*Tinker* teaches that schools are not helpless to enforce the reasonable order necessary to accomplish their mission. Again, school officials may curtail speech if they can show "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." 393 U.S. at 514. We have similarly stressed that, "if a school can point to a well-founded expectation of disruption ... the restriction may pass constitutional muster." *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir. 2001). Trying to limit that principle along real property lines is bound to run into trouble, as the *J.S.* concurrence concedes by saying that there can be difficulty in knowing whether speech has occurred on or off campus. *J.S.* Concurrence, slip op. at 8. That concession, though, fails to get at the fundamental difficulty in cases like these. The problem is not in knowing where a speaker was when uttering or otherwise creating speech. Like other historical facts, where a speaker said something is a matter that can be decided by typical fact-finding techniques. If the point of the *J.S.* concurrence is not to question where the speaker was physically so much as to question how to characterize the speech itself, i.e., as having on-campus or off-campus effects, then the definitional exercise only obscures the effort to answer the central dilemma, which is how to balance the need for order in our public schools with respect for free speech. That is the problem *Tinker* aimed to address and it is the problem we are

38

confronting too, so we should be applying rather than avoiding *Tinker*.16

We cannot sidestep the central tension between good order and expressive rights by leaning on property lines. With the tools of modern technology, a student could, with malice aforethought, engineer egregiously disruptive events and, if the trouble-maker were savvy enough to tweet the organizing communications from his or her cellphone while standing one foot outside school property, the school administrators might

16 The *J.S.* concurrence cites *Morse*, as supporting the conclusion that *Tinker* is inapplicable to off-campus speech, noting that the *Morse* Court "took care to refute the contention that the plaintiff's speech … did not occur 'at school'" which "would have been unnecessary" if *Tinker* were meant to apply to off-campus speech. *J.S.* Concurrence, slip op. at 4. That argument mistakes the import of both *Morse* and *Tinker*, however. The subject of the speech in *Morse*, which was an odd reference to illegal drug use, had no relation to the school or school activities. 551 U.S. at 396. In none of the opinions issued today is it suggested that such speech, if it took place off campus and apart from a school sanctioned event, would be covered by *Tinker*. Speech that neither relates to school nor occurs on campus or during a school sanctioned event will in all likelihood lack a reasonable nexus to school and so will be divorced from the question of good order in the school, which is the reach of *Tinker*. Thus, I do not share the concern expressed in the *J.S.* concurrence that applying *Tinker* to off-campus speech would "empower schools to regulate students' expressive activities," or to "suppress political speech" such as "a blog entry defending gay marriage." *J.S.* Concurrence, slip op. at 6.

succeed in heading off the actual disruption in the building but would be left powerless to discipline the student. Perhaps all of us participating in these en banc decisions would agree on that being problematic. It is, after all, a given that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52 (1919), and no one supposes that the rule would be different if the man were standing outside the theater, shouting in. Thus it is hard to see how words that may cause pandemonium in a public school would be protected by the First Amendment simply because technology now allows the timing and distribution of a shout to be controlled by someone beyond the campus boundary.

If it is accepted that the First Amendment would not protect such a deliberate disturbance, we should acknowledge that we are weighing competing interests and do so in the straightforward though sometimes challenging way directed by *Tinker.* Just as society's interest in public safety surmounts any claim of right to raise a false fire alarm, by the same token any claimed right to spread scurrilous falsehoods about school administrators may well be outweighed by society's legitimate interest in the orderly administration of public schools. *Tinker* outlines the approach the Supreme Court has given for undertaking that weighing process.

I worry that the combination of our decisions today in this case and in *J.S.* may send an "anything goes" signal to students, faculties, and administrators of public schools. To the extent it appears we have undercut the reasoned discretion of administrators to exercise control over the school environment, we will not have served well those affected by the quality of public education, which is to say everyone. By way of some little reassurance, then, it bears emphasis that, whatever else may be drawn from these decisions, we have not declared that *Tinker* is inapplicable to off-campus speech simply because it occurs off-campus. Despite differing views on what may constitute a substantial disruption, I hope and believe that we are all mindful of the challenges school administrators face in providing a safe environment, conducive to learning and civic development, for children and young adults. Those challenges have never been greater than they are today. Modern communications technology, for all its positive applications, can be a potent tool for distraction and fomenting disruption. *Tinker* allows school officials to discipline students based on a

41

reasonable forecast of substantial disruption, without waiting for the chaos to actually hit the hallways.

In short, nothing in the First Amendment requires administrators to check their common sense at the school house door. When they must forecast how poisonous accusations lobbed over the internet are likely to play out within the school community, if they "can point to a well-founded expectation of disruption," *Saxe*, 240 F.3d at 212, we ought to be supportive of their reasonable efforts to maintain appropriate order. I concur in the Court's decision in this case, but do not subscribe to any implication that *Tinker* is inapplicable and that school officials would have been powerless to head off a substantial disruption.17

17 I take comfort from certain caveats in the opinion. While putting distance between our Court and the decisions of the United States Court of Appeals for the Second Circuit in *Wisniewski v. Board of Educ. of Weedsport Cent. School Dist.*, 494 F.3d 34 (2d Cir. 2007), and *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008), the opinion for the Court in this case nonetheless acknowledges that those Second Circuit precedents "stand for … the unremarkable proposition that schools may punish expressive conduct that occurs outside of school … ." Slip Op. at 34. It is noteworthy too that the Majority opinion in *J.S.* distinguishes the character of the student speech at issue in the Second Circuit cases from the speech in *J.S.* but it does not make any distinction based on the location of the speaker. In any event, I agree with the Second Circuit's ultimate conclusion in *Wisniewski* that *Tinker* can have applicability to student speech that occurs off-campus. *See Wisniewski*, 494 F.3d at 38

(Ruling on internet speech communicated by a student from a home computer, and holding, "[w]ith respect to school officials' authority to discipline a student's expression reasonably understood as urging violent conduct, we think the appropriate First Amendment standard is the one set forth by the Supreme Court in *Tinker*.")